UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WILLIAM DAVIS,

     PLAINTIFF,

v.                                                  Case No.:    4:23-cv-355

EQUIFAX INFORMATION SERVICES,                       ***JURY DEMAND***
LLC, EXPERIAN INFORMATION
SOLUTIONS, INC., I.Q. DATA
INTERNATIONAL, INC. AND TRANS
UNION LLC,

     DEFENDANTS.

## COMPLAINT

Plaintiff William Davis ("Plaintiff"), by and through the undersigned counsel, and with knowledge as to Plaintiff's own acts, upon information, belief, and investigation of counsel as to the acts of others, believing such allegations have evidentiary support after a reasonable opportunity for further investigation or discovery alleges against Defendants Equifax Information Services, LLC, Experian Information Solutions, Inc., Trans Union LLC,[1] and I.Q. Data International, Inc. as follows:

### PRELIMINARY STATEMENT

1.     This is an action for an actual, statutory, and punitive damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1681, *et seq*. ("Fair Credit Reporting Act" or "FCRA") and 15 U.S.C. §§ 1692, *et seq*. ("Fair Debt Collection Practices Act" or "FDCPA").

---

[1] Defendants Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union LLC are referred to collectively as the "CRA Defendants."

2.     One of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."  15 U.S.C. § 1681(b).

3.     Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'"  *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

4.     Surveys have shown "between 1998 and 2003, approximately 27.3 million adults discovered they were victims of identity theft, with 9.91 million adults discovering they were victims in 2003 alone."  *Id.*

5.     On December 4, 2003, President George W. Bush signed into law the Fair and Accurate Credit Transactions Act ("FACTA").[2]  This legislation gives consumers unprecedented tools to fight identity theft and continued access to the most dynamic credit markets in the world. With a free credit report and powerful new tools to fight fraud, consumers can better protect themselves and their families.[3]

6.     The stated purpose of FACTA is "to prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, make improvements in the use of,

---

[3]   https://georgewbush-whitehouse.archives.gov/news/releases/2003/12/20031204-3.html   Last visited April 11, 2023.

and consumer access to, credit information, and for other purposes."[4]

7.    In 2004, according to the Federal Bureau of Investigation, "[i] Identity theft is one of the fastest growing crimes in the U.S., claiming more than 10 million victims a year.[5]"

8.    Between 2000 and 2014, the Federal Trade Commission ("FTC") identified identity theft as the number one complaint made to the FTC.[6]  In 2022, identity theft complaints make up the number one category of complaints made to the FTC.[7]

9.    In furtherance of its underlying purposes, the FCRA sets out requirements and obligations that consumer reporting agencies ("CRAs"), § 1681i, and their furnishers of information, § 1681s-2(b), must follow when consumers dispute the accuracy of the information reported in their credit reports. *See* 15 U.S.C. §§ 1681s-2(a), (2), (4), (5).

10.    Furnishers have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers under the FCRA were enacted in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

11.    Specifically, a furnisher must satisfy five duties after receipt of notice of a consumer dispute from a CRA.  15 U.S.C. §§ 1681s-2(b)(1)(A-E). *See also Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016); *Boggio v. USAA Federal Savings Bank*, 696

---

[4]    https://www.govinfo.gov/content/pkg/PLAW-108publ159/pdf/PLAW-108publ159.pdf Last visited April 11, 2023.

[5]    https://archives.fbi.gov/archives/news/stories/2004/october/preventidt_102104 Last visited April 11, 2023.

[6]    https://www.ftc.gov/news-events/press-releases/2016/03/ftc-releases-annual-summary-consumer-complaints Last visited April 11, 2023.

[7]    https://www.ftc.gov/reports/consumer-sentinel-network-data-book-2022 Last visited April 11, 2023.

F.3d 611 (6th Cir. 2012); *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426 (4th Cir. 2004); *Van Veen v. Equifax Info.,* 844 F.Supp.2d 599, 605 (E.D. Pa. 2012) (applying *Johnson*).

12.    The FCRA also "provides the primary recourse for victims of identity theft." Christopher P. Couch, *Forcing the Choice Between Commerce & Consumers: Application of the FCRA to Identity Theft*, 53 Ala. L. Rev. 583, 587 (2002).

13.    Thus, the FCRA holds CRAs and furnishers of information responsible for taking reasonable steps to correct a consumer's credit report once the theft is brought to their attention. *See Sloane v. Equifax Info. Services, LLC*, 510 F.3d 495, 506-07 (4th Cir. 2007) ("Of course, Equifax bore not responsibility for the initial theft, but the FCRA makes the company responsible for taking reasonable steps to correct [the plaintiff]'s credit report once she has brought the theft to the company's attention.").

14.    Plaintiff is a victim of identity theft, which is one of the "fastest growing white-collar crimes in the United States. *Sloane v. Equifax Info. Services, LLC*, 510 F.3d 495, 505, 2007 WL 4535267 (4th Cir. 2007).

15.    Plaintiff's credit report included a collection account reported by IQ Data International ("IQ Data") on behalf of the Park Vue of Alexandria Apartments located in Alexandria, Virginia, in the amount of approximately $11,932, account ending in 5853 (hereinafter, the "Account").

16.    The Account is inaccurate because it does not belong to Plaintiff.

17.    Further, at least one CRA Defendant reported an address associated with the Park Vue Apartments, "511 Four Mile Rd., Apt. 708, Alexandria, VA 22305" on Plaintiff's file. The address is inaccurate because Plaintiff never lived at or used this address for mail or credit.

18.     Upon information and belief, the Account and Park Vue address are the result of the theft of Plaintiff's identity.

19.     Plaintiff disputed the inaccurate information to the CRA Defendants.

20.     After Plaintiff disputed the inaccurate information with the CRA Defendants, one or more of the consumer reporting agencies notified IQ Data of Plaintiff's disputes.

21.     One or more of the CRA Defendants also provided IQ Data with Plaintiff's disputes and supporting documents.

22.     Notwithstanding, IQ Data failed to delete the disputed inaccurate information or fully, reasonably, and properly investigate Plaintiff's disputes.

23.     IQ Data continues to report the Account as of today's date.

24.     IQ Data continues to credit report the Account to the CRA Defendants despite notice that the debt was the result of fraud and did not belong to Plaintiff.

25.     Likewise, after receipt of Plaintiff's disputes, the CRA Defendants failed to delete, reinvestigate, or block all the disputed items of information.

26.     The FDCPA is a consumer protection statute enacted to protect consumers from debt collectors who seek to collect debts through illegal means and who engage in false and misleading, unfair, and deceptive practices in the process of attempting to collect a debt.  Like the FCRA, the FDCPA helps protect identity theft victims, such as Plaintiff.

27.     The CRA Defendants have been sued thousands of times wherein an allegation was made that said defendants violated the FCRA.

28.     Similarly, IQ Data has been the subject of hundreds of complaints made by consumers to the Better Business Bureau ("BBB").[8]

29.     A cursory review of the Pacer docket yields hundreds of lawsuits filed against IQ Data wherein an allegation was made that IQ Data violated the FCRA or FDCPA, or both.

30.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).

31.     Notwithstanding thousands of consumer complaints, the sale of consumers' most private and sensitive personal and financial information is a multi-billion-dollar industry for the CRA Defendants' primary sources of revenue – the sale of consumer reports – and  IQ Data's and primary sources of revenue – the collection of consumer debt.

32.     Experian's parent corporation, Experian plc, reported over $ 6,200,000,000.00 billion in revenue for 2022.[9]

33.     Equifax reported $ 5,122,000.000.00 billion in revenue for 2022.[10]

34.     Trans Union reported $ 3,710,000.00 billion in revenue for year ending 2022.[11]

---

[8] https://www.bbb.org/us/wa/bothell/profile/collections-agencies/i-q-data-international-inc-1296-1000051907/complaints Last visited April 11, 2023.

[9] https://www.experianplc.com/media/latest-news/2022/full-year-results-fy22-180522/ Last visited April 11, 2023.

[10]https://d1io3yog0oux5.cloudfront.net/_807c082bf071acdf179103742e11ae70/equifax/news/2023-02-08_Equifax_Delivers_Record_2022_Revenue_of_5_122_1275.pdf Last visited April 11, 2023.

[11] https://investors.transunion.com/~/media/Files/T/Transunion-IR-V2/reports-and-presentations/q4-22-earnings-report.pdf Last visited April 11, 2023.

35. IQ Data received over $ 6,300,000.00 million in revenue in 2022 in connection with the collection of consumer debt.[12]

## JURISDICTION & VENUE

36. This Court has jurisdiction pursuant to 15 U.S.C. §§ 1681p, 1692k(d) and 28 U.S.C § 1331.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district and division. Plaintiff communicated with the defendants concerning the disputed information from this judicial district. The defendants sent communications concerning the Account and the disputed information to Plaintiff in this judicial district. The defendants credit reported the Account with Plaintiff's address in this judicial district.

## PARTIES

14. Plaintiff William Davis ("Plaintiff") is an adult individual and a resident of this judicial district. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(c).

15. Defendant Equifax Information Services, LLC ("Equifax") regularly does business in this judicial district and is a Georgia corporation with its principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309. Equifax is a consumer reporting agency as defined by 15 U.S.C. § 1681a(f).

16. Defendant Experian Information Solutions, Inc. ("Experian") regularly does business in this judicial district and is an Ohio corporation with its principal place of business

---

[12] https://www.zoominfo.com/c/iq-data-international-inc/459042669 Last visited April 11, 2023.

located at 475 Anton Blvd., Costa Mesa, California 92626.  Experian is a consumer reporting agency as defined by 15 U.S.C. § 1681a(f).

17.    Defendant Trans Union, LLC ("Trans Union") regularly does business in this judicial district and is a Delaware limited liability corporation with its principal place of business located at 555 W Adams St., Chicago, Illinois 60661-5753.  Trans Union is a consumer reporting agency as defined by 15 U.S.C. § 1681a(f).

18.    Defendant IQ Data is a Washington corporation with its principal place of business located at 21222 30th Drive SE Ste 120, Bothell, WA 98021-7012. IQ Data is also a person who furnishes information to CRAs under FCRA, 15 U.S.C. § 1681s-2[13], and conducts substantial and regular business activities in this judicial district.

## FACTUAL ALLEGATIONS

19.    Plaintiff is a victim of identity theft.

20.    In or around May 2020, an impostor applied for and opened accounts using some of Plaintiff's personal identifying information ("PII").

21.    One of the accounts was opened in Maryland.

22.    One of the accounts was opened in Virginia at the Park Vue of Alexandria Apartments ("Park Vue").

23.    Plaintiff never lived in Maryland or Virginia.

24.    At the time, Plaintiff resided at Curry Rd., in Arlington, TX 76001, and was a student.

---

[13] Plaintiff is making a claim against MoneyLion under § 1681s-2(b).  Plaintiff is not making a claim against said defendant under § 1681s-2(a).

25.    Plaintiff did not apply for or authorize someone on his behalf to apply for credit or a lease with Park Vue.

26.    Plaintiff never lived in Virginia.

27.    Plaintiff did not receive any goods, benefits, or services from Park Vue in connection with the Account.

28.    Plaintiff reported the identity theft to law enforcement.

29.    IQ Data inaccurately credit reported the Account belonged to Plaintiff.

30.    Thereafter, the CRA Defendants prepared consumer reports related to Plaintiff that included the inaccurate information.

31.    The CRA Defendants reported the Account as a derogatory account and as follows:

    a.   collection account;

    b.   seriously past due; and,

    c.   with a past due balance of $ 11,932.

32.    The above reported credit information is untrue.

33.    The inaccurate information harms Plaintiff's credit reputation because the Account history does not accurately depict his credit history or creditworthiness, or both.

### *Plaintiff's Experience with Equifax*

34.    Between 2021 and 2022, Plaintiff disputed the inaccurate information to Equifax no less than three times.

35.    In support of his dispute, Plaintiff provided Equifax with his PII and law enforcement case number and contact information and correspondence with law enforcement.

36.    Equifax purportedly completed its reinvestigations of the disputed Account. Equifax generated at least one dispute results stating it verified the Account belonged to him.

37.    Equifax did not delete the Account after receipt of no less than three (3) disputes.

38.    On at least one occasion, Plaintiff notified Equifax that he was a victim of identity theft and requested his file from Equifax. Equifax received Plaintiff's request for his file. On at least one occasion, Equifax failed to provide Plaintiff with his file.

39.    Equifax prepared and continues to prepare consumer reports related to Plaintiff that include the inaccurate information, including but not limited to the Account.

### *Plaintiff's Experience with Experian*

40.    Between 2021 and 2022, Plaintiff disputed the inaccurate information to Experian no less than three times.

41.    In support of his dispute, Plaintiff provided Experian with his PII, law enforcement case number, contact information and correspondence from law enforcement.

42.    Experian purportedly completed its reinvestigations of the disputed Account. Equifax generated at least one dispute results stating it verified the Account belonged to him.

43.    Experian did not delete the Account after receipt of no less than three (3) disputes.

44.    On at least one occasion, Plaintiff notified Experian that he was a victim of identity theft and requested his file from Experian. Experian received Plaintiff's request for his file. On at least one occasion, Experian failed to provide Plaintiff with his file.

45.    Experian prepared and continues to prepare consumer reports related to Plaintiff that include the inaccurate information, including but not limited to the Account.

### *Plaintiff's Experience with Trans Union*

46.    Between 2021 and 2022, Plaintiff disputed the inaccurate information to Trans Union no less than three times.

47.     In support of his disputes, Plaintiff provided Trans Union with his PII, law enforcement case number, contact information and correspondence from law enforcement.

48.     Trans Union purportedly completed its reinvestigations of the disputed Account. Equifax generated at least one dispute results stating it verified the Account belonged to him.

49.     Trans Union did not delete the Account after receipt of no less than three (3) disputes.

50.     On at least two occasions, Trans Union misrepresented to Plaintiff that he did not send additional relevant information in support of his dispute and refused to reinvestigate the disputed information.

51.     On at least two occasions, Plaintiff notified Trans Union that he was a victim of identity theft and requested his file from Trans Union. Trans Union received Plaintiff's request for his file. On at least two occasions, Trans Union failed to provide Plaintiff with his file.

52.     Trans Union prepared and continues to prepare consumer reports related to Plaintiff that include the inaccurate information, including but not limited to the Account.

### The CRA Defendants' Parroted the Furnisher's Responses to the Disputes and Did Not Perform a Reasonable Reinvestigation of Plaintiff's Disputes

53.     In response to Plaintiff's disputes, the CRA Defendants did not contact third parties, including but not limited to law enforcement or Park Vue, or both, concerning the accuracy of the disputed information.

54.     The CRA Defendants also did not review underlying account documents related to the Account contained in Plaintiff's file or the subject of Plaintiff's disputes, or both, such as the apartment lease or application for credit.

55.     The CRA Defendants did not conduct any handwriting analysis on Plaintiff's signature or the signature on the application for the Account.

56.     The CRA Defendants did not make a reasonable inquiry into the disputed information.

57.     The CRA Defendants did not review all relevant information provided by Plaintiff related to the disputed information.

58.     At best, the CRA Defendants verified the false information simply parroting IQ Data's verification of Plaintiff's ownership of the Account.

59.     The CRA Defendants failed to modify or delete all the inaccurate information.

60.     Despite Plaintiff's exhaustive efforts to date, the CRA Defendants have nonetheless deliberately, willfully, intentionally, recklessly, and negligently repeatedly failed to perform reasonable reinvestigations of the above disputes as required by the FCRA.

### *Plaintiff's Experience with I.Q. DATA INTERNATIONAL, INC.*

61.     Plaintiff disputed the Account to IQ Data.

62.     IQ Data continued to attempt to collect on the fraudulent debt from Plaintiff.

63.     Plaintiff disputed the inaccurate information reported by IQ Data to the CRA Defendants.

64.     One or more of the CRA Defendants notified IQ Data of the disputed information.

65.     IQ Data notified one or more of the CRA Defendants that it verified the disputed information.

66.     As a part of IQ Data's purported FCRA investigations it did not:

a.     contact third parties, including but not limited to law enforcement or Park Vue, or both, concerning the accuracy of the disputed information;

b.     review underlying account documents, such as the lease or any application for credit;

      c.      conduct handwriting analysis on Plaintiff's signature or the signatures associated with the Account, and in its own records;

      d.      make a reasonable inquiry into the disputed information, including a review of the correspondence with law enforcement supplied by Plaintiff;

      e.      review all relevant information provided by a consumer reporting agency pertaining to the disputed information; or,

      f.      modify or delete the false account information.

67.     At best, IQ Data verified the false information by confirming some of Plaintiff's PII related to the Account with some of the PII reported by each of the CRA Defendants who notified IQ Data of Plaintiff's dispute.

68.     IQ Data notified at least one CRA Defendant that its reporting of the inaccurate information was accurate on no less than seven (7) times.

69.     IQ Data did not conduct a reasonable investigation with respect to the disputed information.

70.     As of result of the defendants' conduct, Plaintiff has suffered multiple concrete and particularized injuries that are unique and distinct in the form of adverse credit action, damage to credit reputation, loss of time, out-of-pocket expenses and emotional distress.

71.     At all times pertinent hereto, the defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the defendants herein.

72.     At all times pertinent hereto, the conduct of the defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

73.     The defendants' conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the serious and distinct injuries to the Plaintiff that are outlined more fully above and, as a result, the defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief as may be permitted by law for their violations of federal law.

## COUNT ONE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Equifax)

74.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

75.     Equifax negligently failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i and c-1.

76.     Alternatively, Equifax willfully failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i and c-1.

77.     As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive, and statutory damages, in an amount to be determined by the jury, plus attorneys' fees and costs.

## COUNT TWO – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Experian)

78.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

79.     Experian negligently failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i and c-1.

80.     Alternatively, Experian willfully failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i and c-1.

81.     As a result of Experian's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive, and statutory damages, in an amount to be determined by the jury, plus attorneys' fees and costs.

## COUNT THREE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Trans Union)

82.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

83.     Trans Union negligently failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i, and c-1.

84.     Alternatively, Trans Union willfully failed to comply with the requirements of the FCRA, including Sections 1681e(b), g, i, and c-1.

85.     As a result of Trans Union's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive, and statutory damages, in an amount to be determined by the jury, plus attorneys' fees and costs.

## COUNT FOUR – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against IQ Data, 15 U.S.C. 1681s-2(b)(1)(A))

86.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

87.    On multiple occasions within the past two years, by example only and without limitation, IQ Data failed to comply with the requirements of the FCRA, including Section 1681s-2(b)(1)(A), by failing to fully and properly investigate Plaintiff's disputes.

88.    When Plaintiff disputed the fraudulent account with the CRAs, IQ Data used a dispute system named "e-OSCAR," which has been adopted by the CRAs and their furnisher customers, including IQ Data.

89.    E-OSCAR is an automated system and the procedures used by the CRAs are systematic and uniform.

90.    When a CRA receives a consumer dispute, it (usually via an outsourced overseas vendor) translates each dispute into an automated dispute verification ("ACDV") form.

91.    Upon information and belief, the ACDV form is the method by which IQ Data has elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

92.    Upon information belief, during the two years preceding the date of Plaintiff's Complaint, IQ Data received no less than ten (10) ACDV forms from CRAs notifying it of Plaintiff's disputes.

93.    Moreover, the ACDVs supplied by the CRAs including documents supporting Plaintiff's claims, including but not limited to Plaintiff's dispute letters and correspondence with law enforcement.

94.    IQ Data understood the nature of Plaintiff's disputes when it received the ACDVs.

95.    Upon information and belief, when IQ Data received ACDVs related to Plaintiff's disputes, it followed a standard and systematically unlawful process where it only reviewed its own internal computer screen for the account level information and repeated back the same information on the ACDV system that was previously reported to the CRAs.

96.     Upon information and belief, when IQ Data receives a dispute through e-OSCAR, it does not conduct a substantive review of any sort to determine whether the information already in its computer is itself accurate.

97.     As a result of IQ Data's failure to comply with the requirements of § 1681s-2(b)(1)(A), Plaintiff suffered concrete and particularized actual damages, described more fully above.

98.     IQ Data's conduct in violating the FCRA was willful, making it liable to Plaintiff for punitive for punitive and statutory damages in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, IQ Data was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

99.     As a result of IQ Data's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive, and statutory damages, in an amount to be determined by the jury, plus attorneys' fees and costs.

**COUNT FIVE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**(Against IQ Data, 15 U.S.C. § 1681s-2(b)(1)(B))**

100.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

101.    On multiple occasions within the past two years, by example only and without limitation, IQ Data failed to comply with the requirements of the FCRA, including Section 1681s-2(b)(1)(B), by failing to review all relevant information provided to it by the CRAs.

102.    As Plaintiff detailed in the previous Count, IQ Data has elected to use the e-OSCAR system for its FCRA disputes received through the CRAs.

103.    IQ Data is aware of the meaning of the several dispute codes used by the CRAs in e-OSCAR.

104.    IQ Data does not contend that the ACDV system is an inadequate means to receive FCRA disputes through the consumer reporting agencies.

105.    IQ Data understood Plaintiff's disputes and that Plaintiff claimed the account did not belong to him.

106.    IQ Data understood Plaintiff's disputes and that Plaintiff claimed the account was opened due to fraud.

107.    IQ Data understood the nature of Plaintiff's disputes and that Plaintiff claimed he was a victim of identity theft.

108.    As a result of IQ Data's failure to comply with the requirements of Section 1681s-2(b)(1)(B), Plaintiff suffered concrete and particularized actual damages, described more fully above.

109.    IQ Data's conduct in violating the FCRA was willful, making it liable to Plaintiff for punitive for punitive and statutory damages in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, IQ Data was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

110.    As a result of IQ Data's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

111.    As a result of IQ Data's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual,

punitive, and statutory damages, in an amount to be determined by the jury, plus attorneys' fees and costs.

## COUNT SIX - VIOLATIONS OF THE FDCPA
### (Against IQ Data, 15 U.S.C §§ 1692e and 1692f))

112.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

113.    At all times material herein, Plaintiff was a "consumer" as defined by 15 U.S.C. § 1692a(3), since he is a natural person allegedly obligated to pay a consumer debt.

114.    At all times material herein, the Account (Plaintiff's alleged debt) was a "debt" as defined by 15 U.S.C. § 1692a(5).

115.    At all times material herein, IQ Data was a "debt collector" as defined by 15 U.S.C. § 1692a(6).

116.    IQ Data falsely stated Plaintiff owed a debt on the Account.

117.    As detailed above, Plaintiff did not have any connection to the Account.

118.    Despite Plaintiff's repeated disputes to IQ Data and the CRAs that the Account did not belong to him, IQ Data continued to claim that the Account belonged to Plaintiff and that he owed the debt.

119.    IQ Data's credit reporting of the Account was a false representation of the character, amount, and legal status of a debt in violation of the FDCPA. 15 U.S.C. § 1692e(2)(A)(10).

120.    IQ Data continued to claim Plaintiff owed the debt for the Account after his disputes was also a false representation and deceptive practice in violation of the FDCPA. 15 U.S.C. § 1692e.

121.    IQ Data repeatedly used unfair or unconscionable means, or both, to collect or attempt to collect the debt, specifically the disputed collection Account, from Plaintiff. IQ Data did so even though Plaintiff doesn't owe the debt because it is the result of fraud, in violation of 15 U.S.C. § 1692f.

122.    IQ Data's violations of the FDCPA caused Plaintiff to worry about his financial situation and the impact on his credit, as well as stress and frustration.

123.    Plaintiff also lost time because of his efforts to clear his name with IQ Data.

124.    As a result of IQ Data's violations of the FDCPA, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against IQ Data pursuant to 15 U.S.C. § 1692k.

## JURY DEMAND

125.    Plaintiff requests a jury trial on all claims.

## PRAYER

Wherefore, Plaintiff prays for judgment against Defendants as follows:

**On the First Claim for Relief**:

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury;

4.  Attorneys' fees and costs; and,

5.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**On the Second Claim for Relief:**

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury;

4.  Attorneys' fees and costs; and,

5.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**On the Third Claim for Relief:**

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury;

4.  Attorneys' fees and costs; and,

5.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**On the Fourth Claim for Relief:**

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury; and,

4.  Attorneys' fees and costs; and,

5.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**On the Fifth Claim for Relief:**

1.  Actual damages to be determined by the jury;

2.  Punitive damages to be determined by the jury;

3.  Statutory damages to be determined by the jury;

4.  Attorneys' fees and costs; and,

5.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

**On the Sixth Claim for Relief:**

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury;

4. Attorneys' fees and costs; and,

5. Granting further relief, in law or equity, as this Court may deem appropriate and just.

Respectfully submitted,

*/s/ Micah S. Adkins*
Micah S. Adkins
TX BAR NO. 24088777
**THE ADKINS FIRM, P.C.**
ONE LINCOLN CENTRE
5400 Lyndon B. Johnson Fwy.
Suite 1200
Dallas, Texas 75240
(214) 974-4030 Telephone
MicahAdkins@ItsYourCreditReport.com
*COUNSEL FOR PLAINTIFF*
*WILLIAM DAVIS*